

**SIGNED this 12th day of December, 2011.**

_____
JOHN C. AKARD
UNITED STATES BANKRUPTCY JUDGE
_____

# United States Bankruptcy Court
Western District of Texas
San Antonio Division

| *In re* | BANKR. CASE NO. |
|---|---|
| NORMAN R. WILLIAMS, SR. AND JOAN S. WILLIAMS | 09-52514 |
| *Debtors* | CHAPTER 7 |
| JOHN & BETTY KWASNESKI AND HATSUKO CONNOR<br><br>*Plaintiffs,*<br>v.<br><br>NORMAN R. WILLIAMS, SR. AND JOAN S. WILLIAMS<br><br>*Defendants.* | ADV. NO. 10-05077 |

**MEMORANDUM OF OPINION**

The Plaintiffs in this adversary proceeding are John and Betty Kwasneski and Hatsuko Connor (Mrs. Kwasneski's mother). The Debtors / Defendants in this case are Norman and Joan

1

Williams. The Plaintiffs filed this adversary proceeding against the Defendants on June 25, 2010. The Plaintiffs' complaint included a claim to determine the dischargeability of debt pursuant to 11 U.S.C. § 523(a)(2)(A) and four objections to the Debtors' discharge pursuant to 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4) and (a)(5). Although the Plaintiffs' complaint necessarily relied on various-fraud and misrepresentation-based allegations, this is, in essence a breach of contract / breach of warranty case.

The Defendants filed for relief under Chapter 13 on July 6, 2009. On March 24, 2010, the case was converted to chapter 7.

The Defendants are the owners, managers and sole employees of Williams Building Consultants, LLC ("WBC"). In February 2006, the Plaintiffs negotiated and entered into a contract with WBC whereby WBC agreed to construct a home for the Plaintiffs for $351,000 on a lot recently conveyed to WBC by the Defendants. The evidence presented at the hearing established that during the negotiations preceding the signing of the contract, Mrs. Williams told the Plaintiffs about the other homes that the Defendants had built in the neighborhood, showed the Plaintiffs the Defendants' own home, which Mrs. Williams represented they had built, and promised that the Plaintiffs' home would be constructed in accordance with certain plans and specifications. The Defendants also told the Plaintiffs that, because they would be neighbors, if any problems arose after construction, the Plaintiffs would fix such problems at no cost. Mr. Kwasneski testified that when they entered into the contract for the construction of the home, they understood the Williams to be the sellers of the home.

The evidence further showed that shortly after moving into the home, the Plaintiffs began to experience various deficiencies in the construction of the house. Specifically, the roof of the home leaked, there was no flashing above the windows, the driveway only had one culvert for drainage as opposed to the two culverts contemplated in the plans and specifications, the hill behind the home had not been adequately cut back, causing drainage problems in the yard, and the garage had been built at the same level as the adjoining patio such that the garage flooded when it rained. Additionally, the Plaintiffs complained that the home only contained two HVAC units whereas three had been contemplated by the plans, thus causing heating and cooling problems in the house. There were also apparently some issues with cracking in the home's stucco and concrete surfaces as well as issues with stairs and doors not having been built to code.

The Plaintiffs brought the issue of the leaking roof to the attention of the Defendants, who attempted to repair the roof, apparently without success. Similarly, the Defendants remedied some of the issues with the HVAC system, but some issues appear to remain unresolved.

Eventually, in May 2008, the Plaintiffs hired a remodeling company to inspect the property and come up with an estimate of the cost to repair the home. David Ratcliff testified

that, based on previous inspection reports of the home as well as his own observations, he discovered numerous deficiencies in the construction of the house, poor installation of the roof causing leaking, no flashing, poor installation of exterior stucco, insufficient drainage around the outside of the house, uneven front steps, only one culvert under the driveway, and the fact that the back patio and the garage were the same height, causing flooding. Ratcliff estimated that it would cost $133,932.48 to repair these problems. Evidence was also presented by James D. Bradley, Registered Professional Engineer, regarding the presence of mold in the home due to the various drainage and leakage problems with the house. As a result of these numerous construction deficiencies, Mr. Kwasneski testified that he believed the value of his home had declined by about $100,000 (from the $351,000 he had paid for it).

Despite the Plaintiffs' fervent allegations of fraud, the court finds that the evidence presented does not establish that the Defendants committed fraud. Any debt owed by the Defendants to the Plaintiffs will thus be dischargeable in the Plaintiffs' bankruptcy case.

1. <u>11 U.S.C. § 523(a)(2)(A) – Claim to Determine Dischargeability of Debt</u>

Section 523(a)(2)(A) provides, that a debt will not be discharged in bankruptcy if it is "for money, property, services, or an extension, renewal, or refinancing of credit," to the extent that it was "obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). To establish "false pretenses" or "false representations" under section 523(a)(2)(A) "the creditor must show '(1) a knowing and fraudulent falsehood; (2) describing past or current facts; (3) that was relied upon by the other party.'" *Turbo Aleae Invs., Inc. v. Borschow (In re Borschow)*, 2011 Bankr. LEXIS 1332, at *44 (Bankr. W.D. Tex. Apr. 8, 2011) (quoting *RecoverEdge, LP v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995)). For a debt to be deemed non-dischargeable for actual fraud a creditor must show:

> (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its reliance.

*Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005). "A creditor must prove its claim of nondischargeability by a preponderance of the evidence." *Jacobson v. Ormsby (In re Jacobson)*, 2007 U.S. App. LEXIS 17844, at *5 (5th Cir. July 26, 2007).

Under section 523(a)(2)(A), the test for "false pretenses" or "false representations," as applied by courts within the Fifth Circuit, includes elements that somewhat differ from, but also overlap with, those elements required for "actual fraud." *Turbo Aleae Invs., Inc. v. Borschow (In re Borschow)*, 2011 Bankr. LEXIS 1332, at *43-44 (Bankr. W.D. Tex. Apr. 8, 2011); *see also RecoverEdge*, 44 F.3d at 1292-93, 1293 n. 16 (noting the distinction but also stating that the addition of "actual fraud" to section 523(a)(2)(A) in 1978 did not change the existing case law

3

requiring a creditor to show actual or positive fraud; rather it was merely meant to clarify existing case law on the limited scope of the fraud exception to discharge) (citing the discussion in 3 COLLIER ON BANKRUPTCY, ¶ 523.08[5] at 523-58 regarding the addition of "actual fraud" to section 523(a)(2)(A)); *but see Acosta*, 406 F.3d at 372 (listing the five elements noted above in connection with all three prongs of section 523(a)(2)(A) generally).

As recently explained by the bankruptcy court for the Western District of Texas in *Turbo Aleae*,

> 'false representations and false pretenses [must] encompass statements that falsely purport to depict *current or past facts.* [A debtor's] promise . . . related to [a] *future action* [which does] not purport to depict current or past fact . . . therefore cannot be defined as a *false representation or a false pretense.*' *Bank of La. v. Bercier (In re Bercier),* 934 F.2d 689, 692 (5th Cir. 1991), citing *In re Roeder,* 61 B.R. 179 (Bankr. W.D. Ky. 1986). However, a promise regarding a future action can still form the basis of a non-dischargeable debt under the 'actual fraud' arm of § 523(a)(2)(A) if the debtor made 'promises of future action which, *at the time they were made,* he had no intention of fulfilling.'

2011 Bankr. LEXIS 1332, at *44-45. *See also Ragupathi v. Bairrington (In re Bairrington)*, 183 B.R. 754, 757 (Bankr. W.D. Tex. 1995) (noting that a section 523(a)(2)(A) cause of action for fraud will exist "when a debtor makes promises of current or future action which, at the time they were made, he had no intention of fulfilling") (citing *In re Bercier*, 934 F.2d 689 (5th Cir. 1991)). Here, the Plaintiffs argued that the Defendants made false representations with respect to both past conduct (that the Defendants had built their own house) and future intentions (that the Plaintiffs' house would be built according to the plans and in a good and workmanlike manner).

Regardless of the potentially differing elements under the three prongs of section 523(a)(2)(A), the Fifth Circuit has reiterated that "[a] creditor must prove the debtor's intent to deceive in order to obtain a non-dischargeability judgment under [] § 523(a)(2)(A)." *Friendly Fin. Service - Eastgate v. Dorsey (In re Dorsey)*, 505 F.3d 395, 399 (5th Cir. 2007). In other words, actual fraud, as opposed to constructive fraud, is necessary. The Fifth Circuit has further articulated that section 523(a)(2)(A) excepts from discharge "debts obtained by frauds involving 'moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made.'" *Acosta*, 406 F.3d at 372 (*citing In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992)). The intent to deceive "may be inferred from 'reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation.'" *Id.* (*citing In re Norris*, 70 F.3d 27, 30 n.12 (5th Cir. 1995), *citing In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994.).). "Nevertheless, an honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive... Thus, a 'dumb but honest' defendant does not have scienter." *Id*. (citations omitted).

4

Here, the evidence was simply insufficient to establish that the Defendants knowingly made false representations with the intent to deceive the Plaintiffs. The Defendants represented that they had built other houses in that neighborhood, including the Williams' own house. These statements (as discussed more fully below) were not false or misleading in any way. Additionally, the Defendants represented that the Plaintiffs' home would be built according to certain plans and specifications, would be built to code, and would be built in a good and workmanlike manner. But merely promising that a home will be built in accordance with certain plans and specifications does not amount to fraud unless, at the time of the promise, the speaker had no intention of following through on that promise. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) ("A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act….Failure to perform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made.") (citations omitted). In this case there was simply no evidence that the Williams' knowingly made false promises and representations to the Plaintiffs with the intent to deceive them and induce them to purchase the home. The Plaintiffs' complaints arise out of the Williams' failure to perform certain contractual obligations as promised; the Plaintiffs' damages arise from breach of contract, not from any false statements or representations.

The evidence did show that Mrs. Williams told the Plaintiffs about the other houses they had built in the neighborhood. Mr. Williams admitted at trial that he was not a very experienced builder; he further maintained that his experience was represented by the other houses he had built. The Plaintiffs did not establish that the Williams over-stated their qualifications or made any representations other than talking about and showing the Plaintiffs the other homes they had built. The evidence also showed that Mrs. Williams gave the Plaintiffs a tour of the Williams' home, stating that the Williams had built that house as well. The Plaintiffs established that, contrary to the Williams' assertions that they had built this house, the Williams' son-in-law (and not the Williams) had been the general contractor on that project. While the Williams' representation that they "had built their house" might ordinarily have a whiff of fraud about it, this actually reflects a common practice in Texas. Under Article 16, section 50(a) of the Texas Constitution, one may only hold a valid mortgage on a homestead if the mortgage was taken out for one of the purposes specifically enumerated in that section. *See* TEX. CONST., ART. XIV, § 50(a) (providing that the homestead is protected from forced sale for the payment of a debt unless the debt is for purchase money for the homestead, taxes due on the homestead, an owelty of partition, the refinance of a lien against the homestead, work and materials used to construct improvements on the homestead, or a home equity line of credit (if certain stringent conditions are satisfied)).[1] Accordingly, banks providing financing for the construction of a home

---

[1] "Under Texas law, a claimant may establish homestead rights in his land by showing both (i) overt acts of homestead usage and (ii) the intention on the part of the owner to claim the land as a homestead. Once the claimant has made a prima facie case in favor of homestead status, the objecting party has the burden of

customarily require that there be a mechanics lien contract with a third party (as opposed to the homeowner) to ensure that no questions arise regarding whether the mortgage was for improvements to the homestead (one of the listed purposes for which a valid mortgage may be given under section 50 of the Texas Constitution). Here, the Williams "hired" their son-in-law as the general contractor likely to satisfy the bank that was providing the financing. This is common practice. Furthermore, the evidence showed that although Mr. Williams was not the named general contractor, he was the one who, in fact, supervised the project and performed all of the duties ordinarily performed by general contractors. Accordingly, the court finds that Mrs. Williams' statement that they "built their house" was not a material misrepresentation and was not intended to deceive the Plaintiffs.

One other potentially fraudulent statement was raised at the trial. Mrs. Williams signed an affidavit to the title company affirming that no liens existed on the Plaintiffs' home and that all subcontractor invoices had been paid. This statement was, in fact, not entirely true. While there was no evidence that any liens had been filed against the Plaintiffs' home at that time, there was evidence that not all of the subcontractors had been paid. Nonetheless, any misrepresentations in the affidavit to the title company could not have injured the Plaintiffs in any way. Only the title company stood to suffer from false statements contained in the affidavit. Furthermore, this, too, is common practice in the real estate business. Thus, the court finds that the false statements contained in the affidavit do not satisfy the elements required to prove fraud against the Plaintiffs. Mrs. Williams testified that all subcontractors had been paid.

In short, the Plaintiffs have not satisfied their burden with respect to section 523(a)(2)(A) of the Bankruptcy Code. Accordingly, the court finds that any debt to the Plaintiffs is dischargeable in the Williams' bankruptcy case.

2. <u>11 U.S.C. § 727 – Objections to Discharge</u>

The Plaintiffs objected to the Defendants' discharge on several grounds. The Plaintiffs argued that the Defendants made numerous false statements and omissions in their schedules. The Plaintiffs argued that the Defendants 1) undervalued their jewelry; 2) undervalued two pieces of real property; 3) undervalued several antique vehicles; 4) failed to list at least two vehicles in their original schedules; 5) failed to list their pets in the original schedules, and then

---

demonstrating that the homestead rights have been terminated. Bankr. R. 4003(c)… The long-standing rule in Texas is that absent actual physical occupancy of the property, intent to homestead must be accompanied by an overt act that evidences that intent. The homestead character of property can be established before occupancy when the owner intends to improve and occupy the premises as a homestead… The intent element is more difficult to satisfy in situations in which the homestead claimant does not already reside on the property… merely testifying that at some future time the property owner intends to reside on the property as a homestead is insufficient, without evidence of overt acts." *Graham v. Kleb*, 2008 U.S. Dist. LEXIS 6495, *5-6, *8-9 (S.D. Tex. Jan. 29, 2008) (citations omitted).

failed to list puppies in later schedules; 6) undervalued a train set in their schedules; 7) and failed to list two bank accounts where the Defendants had loans in their original schedules.

The Plaintiffs further argued that two days before the Defendants filed for bankruptcy, they traded in a 2005 Buick Rendezvous valued at $8,200 and purchased a 2009 Buick Enclave the value of which the Defendants listed as $34,000. The Plaintiffs argued that the Defendants failed to disclose the trade-in of this car on their Statement of Financial Affairs, in violation of the requirement to list all transfers of property that took place within 2 years prior to filing for bankruptcy.

Section 727, titled "Discharge," governs the requirements that must be met for a debtor's discharge to be denied as a whole as a result largely of post-petition actions taken by a debtor. Although Section 727 is lengthy, the case herein deals only with Sections 727(a)(2), (3), (4) and (5), which provide:

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
   (A) property of the debtor, within one year before the date of the filing of the petition; or
   (B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case--

(A) made a false oath or account;

(B) presented or used a false claim;

(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

> (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;
>
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;…

11 U.S.C. § 727(a).

Under Bankruptcy Rule 4005, "the plaintiff has the burden of proving the objection." FED. R. BANKR. P. 4005. This rule applies to both the burden of proof as well as the burden of going forward with evidence. *Martin Marietta Materials Southwest, Inc., et. al. v. Robert Lee, et. al. (In re Lee)*, 309 B.R. 468, 476 (Bankr. W.D. Tex. 2004). If evidence establishes any of the required grounds, the burden then shifts to the defendant to come forward with evidence explaining his or her conduct. *Id*. However, due to the policy of the Bankruptcy Code in providing a debtor with a 'fresh start' via the discharge, "the provisions of *section 727(a)* are to be liberally construed in favor of the debtors, and strictly construed against the party objecting to discharge." *Id*. "Courts should deny discharge only for very specific infractions." *Id*. (citations omitted).

    (A)    <u>11 U.S.C. § 727(a)(2)</u>

The court will first address the Plaintiffs argument that the Defendants' discharge should be denied under section 727(a)(2)(A) because, with intent to defraud, the Defendants traded-in their old car for a 2009 Buick (worth substantially more than the old car) just a couple days before the Defendants filed for bankruptcy.[2] As noted above, the Plaintiffs bore the burden of proving that the Defendants had a bad intent. "[E]vidence of actual intent to defraud creditors is required to support a finding sufficient to deny a discharge [and] constructive intent is insufficient." *In re Lee*, 309 B.R. at 481. Furthermore, it bears noting that the court in *In re Lee* engaged in an extensive discussion, citing Fifth Circuit precedent, wherein the court concluded that merely taking advantage of exemptions, without fraudulent intent, is not a violation of § 727(a)(2). *Id*. at 482-483. In other words, something other than merely converting non-exempt property into exempt property is required to show actual intent. *Id*.

---

[2] The Plaintiffs also argued that the failure to list this trade-in on their first SOFA warranted a denial of discharge under section 727(a)(4). Mrs. Williams credibly testified that she did not understand that the trade-in of their old car constituted a "transfer" as described on the SOFA forms. The amended SOFA, filed on September 3, 2009, properly listed this trade-in. The 2009 Buick was, at all times, listed on the Defendants' schedules with a value of $34,000. Additionally, the monthly payments on the 2009 Buick, as listed by the Debtors in their SOFA, were actually lower than the monthly payments on the car they traded in.

8

Because of the difficulty in proving intent, six badges of fraud have been used to assist courts in inferring bad intent based on circumstantial evidence:

> (1) the lack or inadequacy of consideration;
> (2) the family, friendship or close associate relationship between the parties;
> (3) the retention of possession, benefit, or use of the property in question;
> (4) the financial condition of the party sought to be charged both before and after the transaction in question;
> (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
> (6) the general chronology of the events and transactions under inquiry.

*Neary v. Guillet (In re Guillet)*, 2008 Bankr. LEXIS 2971, at *40-41 (Bankr. E.D. Tex. 2008) (citing *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 702 (5th Cir. 2003). Here, no evidence was presented showing that the Defendants had the requisite fraudulent intent when they traded in their old car for the 2009 Buick (now claimed as exempt). The Defendants' discharge will not be denied under section 727(a)(2)(A).

(B)     11 U.S.C. § 727(a)(3)

The Plaintiffs also argued that the Defendants' discharge should be denied under section 727(a)(3) because the Defendants "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which [their] financial condition or business transactions might be ascertained." Absolutely no evidence of any such concealment or destruction was presented at the trial. The Defendants' discharge will not be denied under section 727(a)(3).

(C)     11 U.S.C. § 727(a)(4)

The court will now address the Plaintiffs' under-valuation and omission arguments under section 727(a)(4)—which make up the bulk of the Plaintiffs' complaints. The purpose of denying a debtor's discharge under Section 727(a)(4)(A) was set forth by the Fifth Circuit when it said that

> [f]ull disclosure of assets and liabilities in the schedules required to be filed by one seeking relief under Chapter 7 is essential, because the schedules 'serve the important purpose of insuring that adequate information is available for the Trustee and creditors without need for investigation to determine whether the information provided is true.'

9

*Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. Tex. 2005) (citations omitted). The elements a plaintiff must satisfy to prevail under this section include the following:

> To establish a false oath, the creditor must show that '(1) [the debtor] made a statement under oath; (2) the statement was false; (3) [the debtor] knew the statement was false; (4) [the debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.' *In re Pratt*, 411 F.3d at 566 (citing *Beaubouef*, 966 F.2d at 177).
>
> The objecting party must show by a preponderance of the evidence that the debtor made a false oath or account with either the intent to defraud or with reckless indifference to the truth. *In re Sholdra*, 249 F.3d 380, 382 (5th Cir. 2001); *Grogan v. Garner*, 498 U.S. 279, 287, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).
>
> Such a determination 'can be proven by circumstantial evidence.' *In re Sholdra*, 249 F.3d at 382 (citing *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989)).
>
> Such false oaths sufficient to justify the denial of discharge include '(1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at the examination during the course of the proceedings.' *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir.1992) (quoting 4 COLLIER ON BANKRUPTCY P 727.04[1] (15th ed.1992)).

*Comerica Bank v. Rajabali (In re Rajabali)*, 365 B.R. 702, 714 (Bankr. S.D. Tex. 2007); *In re Lee*, 309 B.R. 468, 477 (Bankr. W.D. Tex. 2004). Thus, a debtor may be denied a discharge for making a false statement on his schedules or at a meeting of creditors under § 341(a) of the Bankruptcy Code. However, the plaintiff bears the burden of proof in this case to establish all of the required elements by a preponderance of the evidence.

The following is a discussion of the relevant changes and additions that took place in the four sets of schedules—July 31, 2009; September 3, 2009; June 15, 2010 and August 5, 2010—filed in this case:

In their original schedules, filed on July 31, 2009, the Defendants listed the value of their jewelry as $15,000—the exact amount allowed for the exemption. In their third amended schedules, filed on June 15, 2010, the Defendants listed the value of their jewelry as $29,350.00, noting that this was the insured value of the jewelry. Lastly, on their fourth amended schedules, filed on August 5, 2010, the Defendants listed the value of their jewelry as $12,363.00, noting that this was the "appraised value." Apparently, the Defendants had their jewelry formally

appraised following a request from the Trustee to do so. Although the originally listed value of $15,000 seems a little suspect, the Defendants were not required to obtain an official appraisal of their jewelry before filing their schedules. Furthermore, the final amended schedules reflected a value of $12,363—less than the originally scheduled amount. The court finds that, in light of the amendments to the value of the Defendants' jewelry, the Defendants lacked the requisite fraudulent intent when they originally scheduled the value of their jewelry as $15,000.

Regarding the two pieces of real property the Plaintiffs claimed the Defendants under-valued: the Defendants listed the value of these pieces of property as $34,000 each. The evidence showed that this was the value listed on the tax rolls of Comal County for these lots. While the evidence also showed that the Defendants originally tried to sell these lots for substantially more than $34,000, after several price drops, these lots have still not sold. Mr. Williams also testified at the 341 meeting held on August 26, 2009 that he would accept $68,000 for both lots if someone offered that, because real estate was not selling at that time. The court finds that although conflicting testimony was presented regarding the proper valuation for these lots, scheduling the value of these lots as the value listed by the county taxing authorities is a common practice. The tax value is supposed to reflect the market value of property. Although $34,000 may have ultimately been an under-valuation, it was not improper for the Defendants to list the value of their real property as that reflected in the tax rolls of Comal County. Debtors are not required to hire appraisers and may rely on the tax appraisal value in filling out their schedules.

Regarding the under-valuation of various antique vehicles, the court heard testimony regarding Mr. Williams' valuation process of going through car magazines and drawing comparisons between his cars and the cars listed in the magazines based on various factors. The court also considered the Plaintiffs' objections to Mr. Williams' valuation process. The court found Mr. Williams' testimony to be credible, despite some possible flaws in the evidence used to support Mr. Williams' valuations. The value of antique cars is not easily determined; it depends on, among other things, the condition of the car, whether it is has (or has not) been restored, and whether it does or does not have original parts. The court concludes that any under-valuation (if indeed the cars were under-valued) was not done with the requisite intent to defraud the Defendants' creditors.

The Plaintiffs also argued that the Defendants had undervalued a 1994 pick-up truck, the value of which the Defendants listed as $500, and that they had undervalued a custom Pace American trailer, the value of which the Defendants listed as $1,500. As noted above, the court found Mr. Williams' testimony with respect to the value of these vehicles (which testimony was supported by the transcripts of the August, 2009 341 meeting) to be credible. Mr. Williams testified that the transmission on the pick-up truck needed to be replaced, thus substantially decreasing its value. With respect to the trailer, Mr. Williams testified that although it did have a custom paint job, that paint job—which included the words "Williams Classics"—was very

personalized, thus decreasing the value of the trailer. Furthermore, the Plaintiffs failed to present any evidence regarding the "true" value of these vehicles.

The Defendants also failed to list a boat trailer and buggy in their original schedules—the boat trailer was first listed in the first amended schedules filed on September 3, 2009, and the buggy was first listed in the second amended schedules filed on June 15, 2010. Mr. Williams testified that the boat trailer was not listed as an asset because, while the title was in Mr. Williams name at the time of filing, Mr. Williams had only nominal ownership of the trailer (which actually belonged to Mr. Williams' son-in-law) so that Mr. Williams could obtain a bank loan to build his son-in-law's home by putting the trailer up as collateral. The Trustee, recognizing that the true ownership of the trailer lay with Mr. Williams' son-in-law, permitted the Williams' to re-transfer title to the trailer to the Williams' son-in-law post petition. With respect to the buggy, Mr. Williams testified that he did not originally list the buggy on the schedules because he viewed it as merely a hobby with little or no value. At the 341 meeting, Mrs. Williams noted that the buggy did not have an engine (it was horse-drawn), and thus she did not view it as a vehicle in the conventional sense of the word. The Trustee told the Williams to add the buggy to their schedules with a value of $500 (the price Mr. Williams had paid for it). The Defendants actually ended up listing the value of the buggy as $1,200. While these omissions were indeed materially related to the Defendants' bankruptcy case, the court finds that the Defendants lacked fraudulent intent in omitting these assets from their schedules.

The Defendants' also failed to list their pets (2 dogs and 2 cats) until their first amended schedules, filed in September, 2009, and failed to list 4 puppies until their second amended schedules filed in June, 2010 (nearly a year after the puppies had been born and nearly a year after the puppies were discussed at the first 341 meeting). These, too, were material omissions. Nonetheless, in view of Mrs. Williams' testimony (at trial and at the 341 meeting) that the dogs had been spayed shortly after the birth of the litter at issue here, that Williams no longer showed either of the dogs (thus reducing their value), that they made almost no profit on the puppies (after veterinarian bills, etc.), and the fact that Mrs. Williams readily turned over all proceeds from the post-petition sale of the puppies to the Trustee upon request (without accounting for expenses), the court finds no fraudulent intent in these omissions.

Regarding the under-valuation of the train set and china doll collection, the court finds that insufficient evidence was presented regarding the value of either the train set or the doll collection. The court will make no finding with respect to the value of these items. This is an issue for the Trustee to pursue, should he or she see fit.

Finally, the Defendants' also failed to list two bank accounts in their original schedules: an account with Security Service Federal Credit Union, and an account with Pentagon Federal Credit Union. The Defendants listed these accounts on their first amended schedules (filed in

September, 2009) and stated the value of these accounts as $5.00 each. The testimony at trial showed that these accounts had been established only because the Defendants had loans through these banks, and thus were required to maintain accounts with the banks. Mr. Williams testified at the 341 meeting that no check had ever been written of either of these accounts. The failure to list these nominal accounts was not done with fraudulent intent. The Defendants did not use these accounts and they had no real value to the estate.

In short, the Plaintiffs argued that the Defendants knowingly and fraudulently undervalued or failed to list numerous non-exempt assets in their schedules. For purposes of section 727(a)(4)(A), "'a false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent." *Brandon v. Saba (In re Saba)*, 2007 Bankr. LEXIS 3426, at *26 (Bankr. E.D. La. Sept. 27, 2007). Although courts have taken different approaches to the issue of undervaluing assets,[3] this court finds that the Defendants here were merely ignorant or careless in filling out their schedules; they did not act with the requisite fraudulent intent, and thus their discharge cannot be denied under section 727(a)(4). Although amending a schedule does not nullify a false statement already made, *In re Rajabali*, 365 B.R. at 715-716, it is evidence of lack of intent to defraud. *Id*. Furthermore, as recognized by Judge Gargotta, "there are no such things as perfect schedules." *Partners in Family Medicine v. Nolen*, Case No. 07-01008, at p. 6 (Bankr. W.D. Tex. Dec. 18, 2007) (citing *The Cadle Company v. Guenther (In re Guenther)*, 333 B.R. 759, 768 (Bankr. N.D. Tex. 2005) for the proposition that "[i]t may be close to impossible to produce Schedules and SOFAs that contain no mistaken information, and bankruptcy papers with mistakes are not, alone, enough to bar a debtor's discharge.").

### D.  11 U.S.C. § 727(a)(5)

---

[3] As stated by the bankruptcy court for the Middle District of Pennsylvania:

> Understandably, courts are more reluctant to deny a debtor's discharge when assets are undervalued than when they are undisclosed. At least one court has held that undervaluation of even a single asset is sufficient to provide a basis for denial of discharge under Section 727(a)(4). *Weiner v. Perry, Settles & Lawson, Inc. (In re Weiner)*, 208 B.R. 69 (9th Cir. BAP 1997) (affirming denial of discharge based on finding that ring purchased for $ 6,000.00 and insured for $ 21,000.00 was falsely valued at $ 2,500). 'One material misrepresentation, if accompanied by actual intent to defraud, is sufficient to result in the denial of a discharge.' *In re Guthrie*, 265 B.R. 253, 263 (Bankr. M.D. Ala. 2001). However, other courts have held that undervaluation of even multiple or significant assets was not a sufficient basis for the denial of discharge. *In re Blum*, 41 B.R. 816 (Bankr. S.D. Fla. 1984) (undervaluation of two vehicles not grounds for denial of discharge when trustee had opportunity to have them appraised); *Wines v. Wines*, 114 B.R. 794, 797 (Bankr. S.D. Fla. 1990), aff'd in part and rev'd in part, 997 F.2d 852 (11th Cir. 1993) (lawsuit seeking $ 361,820.00 but listed at value of $ 12,000.00 was not falsely valued when defendant in such suit was in bankruptcy itself and debtor valued suit based on estimated distributions). Some courts have stated simply that materiality does not turn on value. [*In re*] *Olson*, 916 F.2d [481, 484 (8th Cir. 1990)]; *In re Sears*, 246 B.R. 341, 347 (8th Cir. BAP 2000).

*Office of the United States Tr. v. Zimmerman (In re Zimmerman)*, 320 B.R. 800, 807 (Bankr. M.D. Pa. 2005).

Finally, the Plaintiffs argued that the Defendants' discharge should be denied under section 727(a)(5) due to unexplained loss of assets. Specifically, the Plaintiffs argued that the Defendants had failed to explain what happened to the money the Plaintiffs had paid the Defendants to build the house. The Defendants adequately explained (and such explanation is almost unnecessary due to the obviousness of what happened to the money) that the money was used to pay subcontractors to build the house. Mr. Williams testified that only about $200 remained (as "profit") after all relevant parties had been paid. Accordingly, the Defendants' discharge will not be denied under section 727(a)(5).

3. Breach of Contract / Warranty

Having determined that the Defendants should not be denied their discharge under section 727, and that any debt owed by the Defendants to the Plaintiffs is dischargeable in this bankruptcy case, the court now comes to the underlying debt at issue here. Because the debt (if any) has not been previously established by a state court judgment, it falls upon this court to establish the Defendants' liability (if any) to the Plaintiffs as well as the amount of damages.

As stated earlier, this is essentially a breach of contract / breach of warranty case. "A contract is breached when a party fails or refuses to perform an act that it expressly promised to do. Whether a party has breached a contract is a question of law for the court." *Chesson v. Hall*, 2007 U.S. Dist. LEXIS 48290, at *62 (S.D. Tex. July 3, 2007) (citing Texas case law). Here, the Defendants failed to construct the Plaintiffs' home in accordance with local building codes and in accordance with certain essential elements of the plans and specifications made a part of the construction/purchase contract. In addition to establishing breach of contract, the Plaintiffs also established that the Defendants breached the implied warranty to construct the Plaintiffs' home in a good and workmanlike manner.[4] *See Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 354 (Tex. 1987) (recognizing the implied warranty in construction accompanied by a home sale); *Horak v. Newman*, 2009 Tex. App. LEXIS 5629 (Tex. App.--Austin July 21, 2009) (discussing breach of implied warranty in connection with construction of a home).

The Defendants raised the valid issue of whether the Plaintiffs could even state a breach of contract claim against the Defendants individually given the fact that the contract was signed by WBC rather than the Defendants. The Defendants here completely disregarded the corporate form throughout the negotiation and closing process. WBC was essentially a sham corporation. It had no employees, no assets to speak of, and very little money in its bank account. Mrs. Williams testified at the 341 meeting that WBC had been created for the sole purpose of building

---

[4] "Good and workmanlike manner" has been defined as "performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work." *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 354 (Tex. 1987).

the home ultimately purchased by the Plaintiffs. The LLC did not file tax returns separate from the Williams. Additionally, the Defendants consistently referred to their homebuilding business in terms of "we built these houses," rather than "WBC built these houses." The Plaintiffs always understood the Williams to be the sellers of the property, not WBC. Accordingly, the court will allow the Plaintiffs an unsecured claim in this bankruptcy case for the amount estimated to repair the property—$133,932.48—plus $2,500 for the cost of hiring the remodeling company (Mr. Ratcliff) to evaluate the property and produce an estimate for the repairs. This gives the Plaintiffs an unsecured claim in this bankruptcy case for a total amount of $ 136,432.48. If the Williams receive a discharge in their bankruptcy case, this claim, to the extent that it is not paid in their bankruptcy case, will be discharged.

     Judgment accordingly.

####